## Payne *against* Craft.

In an action of ejectment, a connected draft of adjoining lands, certified from the surveyor-general's office, is competent evidence to show location and bound-ary. So also are the field-notes of the deputy-surveyor.

The declarations of one under whom the party to an action of ejectment claims, made while he owned the land, that his title was not good, cannot be given in evidence to affect the title of his vendee.

In an action of ejectment against one who claims title under an intestate upon a judgment against his administrators, and a sheriff's sale thereupon, it is not competent for the plaintiff to give evidence to prove that the administrators had assets in their hands sufficient to pay the judgment and avoid the sale.

A judgment obtained against the administrators of an intestate within seven years after his death, and revived by a note made upon the record of the original judgment, of the agreement of the parties for that purpose, made within every five years, is such a due prosecution of the claim as will preserve the lien of the debt upon the lands of the intestate, according to the provisions of the Act of 1797.

The Acts of Assembly of 1798, 1827 and 1828, limiting and regulating the liens of judgments, are not applicable to such as are originally obtained against the representatives of deceased debtors.

Previously to the Act of 24th February 1834, a suit and judgment against the administrators of a deceased debtor, whether adverse or by confession, bound the lands of the intestate without notice to the heirs, and a sheriff's sale upon such judgment conferred a good title upon the purchaser.

ERROR to the District Court of *Allegheny* county.

Joel Payne and Sarah his wife against Lewis Heidleberg and James S. Craft. This was an action of ejectment for the recovery of 160 acres of land, more or less, situated in Pitt township. Hei-dleberg was tenant, and James S. Craft the landlord of the pre-mises. The plaintiffs claimed title on two grounds: 1. Through Juliet Semple, to the whole tract; or, 2. Through Steel Semple, to an undivided moiety. Juliet Semple was an only daughter of Samuel Semple, was born in or about the year 1780, and was married to Steel Semple, June 4th 1801. They had two children, viz., Edward, born June 8th 1802, and Sarah, the present plain-tiff, born September 1st 1805. Juliet died in 1808; Steel Semple died intestate on the 16th April 1813; Edward Semple died, a minor and intestate, January 27th 1815. Sarah Semple was the sole surviving heir of Juliet Semple, and was married to Joel Payne, the plaintiff, in or about the year 1832.

The plaintiffs derived their title to an undivided moiety of the land from Steel Semple in the following manner, viz.: Juliet Sem-ple was the second wife of Steel Semple. By his first wife he had two children, George and Catherine. George died intestate, un-married and without children, about 1817. Catherine married

John Williams, and died leaving several children, the issue of that marriage, who are still living.   Thus Sarah Payne, the plaintiff, was the sole heir of Juliet Semple, her mother, and, with the children of Catherine Williams, who represented their deceased mother, she was the heir to an equal, undivided half of the estate of Steel Semple, her father.

The plaintiffs gave in evidence an application in the name of Juliet Semple, dated the 18th April 1788, for 150 acres of land, upon which a warrant issued to her, and a survey made and returned in her name of 160 acres 10 perches, the land in dispute. It was alleged by the plaintiffs that this land was the property of Juliet Semple; and by the defendants that it was her father's, Samuel Semple; that she being then about eight years of age, her name was used by her father to obtain the title.   There was much evidence with regard to this fact; it was the important fact in the cause, and was submitted as such to the jury.   The defendants claimed under Samuel Semple.

The defendants offered a connected draft, certified from the land office, containing the survey of Juliet Semple and the adjoiners, for the purpose of showing the relative position of this tract and those adjoining it, and called for by it.   This was objected to by the plaintiffs, the objection overruled, and a bill of exceptions sealed.

The defendants offered to read from the book of field-notes as identified to be in the handwriting of Col. Alex. M'Lean, deputy-surveyor, being field-notes, entitled " Samuel Semple's land, surveyed 24th May 1769," in connection with proof that Samuel Semple was in possession of the whole land included in the lines set forth in the field-notes, and including the land in dispute, previous to 1788, exercising acts of ownership, and so continued till the time of his death.   This evidence was offered for the purpose of showing that Samuel Semple, the father of Juliet, the warrantee, was the real owner of the application afterwards taken out in the name of his daughter, and that the title of Samuel Semple was by divers conveyances vested in the defendant, James S. Craft.   This was objected to by the plaintiffs on the ground that the field-notes of Alexander M'Lean were not evidence to show title in the defendant; the book had no authority, was not proved to have been found in the office of the deputy, nor did it purport to be official, or connect itself with the application of Samuel Semple, or the warrant of the defendant.   The objections were overruled, and exceptions taken by the plaintiffs.

. The defendants gave in evidence the will of Samuel Semple, dated 8th February 1808, by which he devised the land in dispute to his son, Steel Semple: an action by James Ross, Esq., against William Wilkins, Henry Baldwin and Walter Forward, adminis-. trators of Steel Semple deceased, brought to November term 1819, to which the defendants appeared and confessed judgment, 10th

[Payne v. Craft.]

March 1821, for $459.57. The following entries were made upon the record of this judgment:

"It is agreed that this judgment shall be revived without a *scire facias*, 22d August 1822.

W. Forward,
Defendants' Attorney."

"August 4th 1823, as per writing filed, it is agreed that the year and day shall not begin to run till this day.

W. Forward,
Attorney for Defendants."

To April term 1828 a *scire facias* issued to revive the judgment, to which the defendants appeared and confessed judgment *de bonis intestati*. On the 8th December 1831, " the defendants agree that the old judgment stand revived as per writing filed." A *fieri facias* issued to June term 1832, which was levied upon the land in dispute as the property of Steel Semple deceased, and upon a *venditioni exponas* the same was sold to James Ross, Esq. The defendant then offered in evidence the deed of the sheriff, dated 19th June 1833. The plaintiffs objected that the execution, sale and deed conferred no title on James Ross, the lien of the judgment having been lost by neglect to revive as against the heirs of Steel Semple. The objections were overruled and the deed read, and the plaintiffs excepted.

18th October 1834, deed, James Ross, Esq., to James S. Craft.

The defendants also gave in evidence a judgment of William Johnston against the administrators of Steel Semple, to January term 1815, upon which a *fieri facias* issued to August term 1815, which was levied upon the same land in dispute, and upon a *venditioni exponas* to November term 1815 it was sold to William Wilkins, to whom the sheriff made a deed, and to whom the sheriff made return that he had paid over the purchase money after deducting costs.

The plaintiffs proposed to prove the amount of debts due by the estate of Steel Semple deceased, and of the personal assets which came to the hands of the administrators; also the amount of moneys received by William Wilkins and Henry Baldwin, by sales made under the declaration of trust; also the amount received on sale of a lot belonging to Steel Semple on Water street; also the sale of 1955 acres of land in different tracts in Butler county, on *testatum* writs, which were bought in by the administrators; also that lots in Franklin, Venango county, were sold for taxes, and the deed made by the purchasers at the tax sales to the administrators; all offered for the purpose of showing that the administrators had in their hands sufficient assets to pay all the debts of the deceased, prior to the sale of the Juliet Semple tract to William Wilkins in 1815; in order to show that William Wilkins was a trustee for the rightful heirs, or that the sale was void for fraud;

[Payne v. Craft.]

also that both Mr Ross and Mr Craft were aware of the facts. The defendants objected that the matter was irrelevant, and involved the defendant in an inquiry with which he had no concern. The court sustained the objection, and sealed a bill of exceptions.

The plaintiffs proposed to prove that while Mr Ross held the title to this land, he admitted it was bad, and that Mr Craft bought from Ross with a full knowledge of the facts, and of Ross's admissions. The defendants objected to the matter as irrelevant. The court sustained the objection, and sealed a bill of exceptions.

GRIER (President) submitted the matter of fact with regard to the original title, whether it was in Juliet Semple or Samuel Semple, to the jury; and instructed them that if they found it to be in Samuel Semple, there was not such an irregularity in the legal proceeding by which the same became vested in James Ross, Esq., as would affect the defendants' title.

*Wylie* and *M'Candless*, for plaintiff in error.
*Metcalf* and *Biddle*, for defendant in error.

The opinion of the Court was delivered by

KENNEDY, J.—It is unnecessary to notice, in detail, the numerous bills of exception to evidence, either admitted or rejected by the court, which have been assigned for error in this cause, as they seem to be without even the semblance of any plausible ground for their support. And as regards the questions presented by the case, upon which it turned finally with the jury, the evidence received or rejected by the court could have had but little or no weight in the determination of them. So that the plaintiffs do not appear to have the slightest ground for alleging that even any possible injury may have been done them by the decision of the court in relation to the evidence which was either admitted or rejected. Whether Juliet Semple had ever been the real owner of the land in dispute was the question, on which the most of the evidence of a loose nature was admitted; but as respects the evidence in relation to this point, the plaintiffs had their full share of indulgence shown them, for they were allowed to give in evidence the declarations of Juliet Semple when a child, or at least a minor, that the land belonged to her, though she never pretended to exercise any act of ownership or authority over it whatever. And yet the plaintiffs opposed the admission in evidence of the declarations of her father going to show that the land was his, accompanied at the same time by a possession of the land and acts of ownership exercised upon it, even long before it was granted by the commonwealth, until the day of his death. A general draft of adjoining lands, certified from the Surveyor General's office, has been admitted in evidence too often to be now questioned, for the purpose of showing location and boundary. And the same may be said of the field-notes taken or made by deputy-surveyors,

showing surveys to have been made by them on the ground. But the declaration of Mr Ross, made before he sold the land in dispute to the defendant, Mr Craft, that the title under which he held and sold it afterwards was bad, was properly rejected by the court; because it was not an admission of any fact in relation to the title or upon which it was founded, but was an admission that his title to the land was bad, which clearly involved a question of law, in regard to which he might be mistaken; and as his opinion would have no influence upon his title to the land, so as to make it either bad or good, it was therefore inadmissible and properly rejected. Its goodness must depend upon the facts connected with it being sufficient in law to make it so, of which the jury, under a proper direction from the court, were to judge. A man's knowledge of his title being bad, when it is really so, may doubtless be given in evidence against him to make him responsible in particular cases when otherwise he would not be so; but if it be good, his opinion cannot make it bad or render him accountable as if it were bad, whatever he might have thought or said of it himself. Here, however, if the title of Mr Ross to the land was good, what he said of it was wholly immaterial to the cause trying in this court. The twelfth bill of exception to evidence was the only one which struck me at first, on the argument, as having something in it, but upon a more full understanding of the case afterwards, I felt perfectly satisfied it was wholly unsustainable. The evidence mentioned in it was offered to show the amount of the debts against the estate of Steel Semple deceased, the amount of the personal assets belonging to it, which came to the hands of the administrators; also the amount of the moneys received by William Wilkins and Henry Baldwin, from sales made by them under the declaration of trust; also the amount received on the sale of a lot belonging to Steel Semple, on Water Street; also the sale of 1955 acres of land, consisting of different tracts in Butler county, on *testatum* writs, which were bought in by the administrators; also, that lots in Franklin, Venango county, were sold for taxes, and the deed made by the purchasers thereof at the tax sales to the administrators. All offered for the purpose of showing that the administrators had in their hands sufficient assets to pay all the debts of the deceased, prior to the sale of the Juliet Semple tract to William Wilkins in 1815; and also to show that William Wilkins became a trustee for the rightful heirs, or that the sale was void for fraud; and further offer to show that both Mr. Ross and Mr. Craft were aware of the facts. Now admitting all that was offered here to be proven to be true, it would not have exempted the Juliet Semple tract from being liable to be taken in execution by the creditors of Steel Semple and sold for the payment of the debts coming to them. Neither could the fact that the administrators had sufficient assets in their hands to pay off

[Payne v. Craft.]

all the debts existing against the estate, preclude Mr Ross from proceeding, or even make it improper in him as a creditor of the estate, to proceed as he did upon his judgment to take the Juliet Semple tract of land in execution, and at the sheriff's sale made thereof, to become the purchaser of the same at the highest price bidden for it.   As long as the administrators withheld payment of his debt, whether they had assets in their hands sufficient to pay it or not, he had an unquestionable right to proceed by execution on his judgment and make the amount of it out of any part of the deceased debtor's estate, and to become the purchaser thereof if he chose.   The previous sale of the Juliet Semple tract by the sheriff to William Wilkins, whether regarded as void or as merely colourable, no money having been paid by him on it, excepting the costs, which were paid out of the assets of the estate, still left it liable as before to be taken in execution and sold for the payment of the debts of Steel Semple, so that all that was offered to be proved amounted to nothing, and could not have availed the plaintiffs in the least.

Then the jury having decided, under the evidence given to them, which was abundantly sufficient to warrant their conclusion that the tract warranted in the name of Juliet Semple never did belong to her, but that it was the property of her father, Samuel Semple, who by his last will devised the same in fee to Steel Semple, the ancestor of the plaintiffs; the only remaining question to be considered is whether the debt owing by Steel Semple at the time of his decease to James Ross, which thereby became a lien upon all the real estate of which he died seised, continued to be a lien thereon, or at least on the Juliet Semple tract of land, until it was sold by the sheriff to Mr Ross.   Anterior to the Act of 1797, the debts of a debtor upon his dying became immediately a lien, without any limitation, upon all the real estate of which he died seised lying within the State, but by that Act the lien was limited to seven years, unless the creditor commenced a suit for the recovery thereof within that period and duly prosecuted the same.   If, however, the debt had or did not become payable within the seven years, then the creditor, instead of bringing a suit for the recovery of it, was required by the Act to file within that period, in the office of the Prothonotary of the county where the lands lay, a copy or particular written statement of the bond, covenant, debt, or demand, as the case might be.   Here, however, the debt owing to Mr Ross was payable within the seven years after the death of Mr Semple, the debtor, who died in April 1813, and to November Term 1819 Mr Ross commenced an action for the recovery of his debt against the administrators of the deceased, and on the 10th of March 1821 obtained a judgment by confession for the amount thereof; and again on the 22d of August 1822 the administrators, by their attorney W. Forward, agreed that the judgment should be revived without *scire facias* by the following

[Payne v. Craft.]

entry made on the record thereof: " It is agreed that this judgment shall be revived without a *scire facias*, 22d Aug. 1822. ·

W. FORWARD,
Defendants' Attorney."

And afterwards on the 4th of August 1823, a writing of the following effect and tenor was filed: " James Ross, Esq. *v.* Wilkins, Baldwin, and Forward, administrators of Steel Semple deceased. Aug. 4th 1823, at the instance and request of the defendants it is agreed, that the year and day shall not begin to run until from and after this date.　　W. FORWARD,
Attorney for Defendants."

And at the same time the following entry was made on the record of the judgment: "Aug. 4th 1823, as per writing filed, it is agreed that the year and day shall not begin to run till this day..

W. FORWARD, ·
Attorney for Defendants."

Then to April Term 1828 a *scire facias* to revive the judgment was sued out, to which the defendants appeared by their attorney, and confessed a judgment *de bonis testatoris*. And again on the 8th of December 1831 the defendants confessed a revival of the judgment, by a writing filed to that effect; upon which an *alias fieri facias* was issued to June Term 1832, by virtue whereof the land in dispute was taken in execution, condemned, and, on a writ of *venditioni exponas* issued to March Term 1833, was sold by the sheriff to James Ross, Esq., for $950. Now from this recital of the proceeding, it is perfectly clear that the action for the recovery of Mr Ross's debt .was not only commenced by him and duly prosecuted within the seven years, while its lien on the lands held by the debtor at the time of his decease was in full force, but that at no time thereafter until the land was taken in execution and sold under the judgment obtained in the action *so brought,* were five years suffered to elapse without some proceeding being had on the judgment, or entry being made on the record thereof by the agreement and consent of the parties, showing that the judgment still remained in full force and unpaid, and that the plaintiff was entitled to have execution of it. The entry of the 4th of August 1823, which has been strongly objected to by the counsel of the plaintiffs in this case, as .wholly insufficient to continue the lien of the debt, we consider amply sufficient for such purpose: it shows most clearly that the debt still remained unpaid and in nowise satisfied, and that the plaintiff was justly entitled to have execution of the judgment in order to obtain payment of it. But it has been argued on behalf of the plaintiffs that the directions of the Acts of 1798, 1827 and 1828 for continuing the liens of judgments therein mentioned, ought to have been observed and strictly complied with by Mr Ross, in order to continue the lien of his debt after he had obtained judgment for it. In answer to this, however, it is sufficient to observe that these Acts

[Payne v. Craft.]

of Assembly do not embrace judgments originally obtained against the executors or administrators of a deceased debtor, but extend merely to judgments obtained against the debtor himself in his lifetime, whereby liens are created on his real estate for the sums so recovered. They are confined exclusively to this latter description of judgments, and prescribe the mode which shall be observed and pursued in order to continue liens created on real estate or lands by virtue of judgments being obtained against the owners thereof, and not liens arising on the death of the debtor by mere operation of law. Neither has this court ever held that these Acts of Assembly embraced, or in their directions ought to be extended to the debts of deceased debtors becoming liens upon their real estates merely by reason of their deaths. The farthest that this court has gone was to adopt, upon a principle of analogy, the five years mentioned in these Acts, and to hold that where no proceeding had been had or act done on a judgment obtained against the personal representatives of a deceased debtor, negativing the idea of its being paid, within five years after the seven years from the debtor's death had expired and the judgment had been obtained, the lien of the debt on the real estate, late of the said debtor, should be considered as extinct and gone. Until the passage of the Act of the 24th of February 1834, the creditor of a deceased debtor was not bound to give notice of his claim to any others than the executors or administrators of the debtor, and upon a judgment obtained in a suit against them alone, without notice to any other, such as the widow, heirs or devisees, of the deceased, he could take in execution and sell the real estate of the deceased. Neither was it the practice in proceeding by suit to recover a debt from the estate of a deceased debtor, to give any kind of notice whatever to the widow, the heirs or devisees, unless they were executors or administrators, although it was intended to charge and take in execution the real estate of the deceased. Service of legal process upon the executors or administrators alone was sufficient for this purpose after a judgment, obtained against them either by confession or otherwise, upon such process, or upon a judgment confessed by them without process. Their assent was all that was requisite either to obtain a judgment or afterwards to keep it alive, so as to enable the creditor to take in execution and sell the real estate of the debtor under it. The courts of the State had no power to change the law and the judicial course of proceeding in this respect, but, on the contrary, it being the established practice and law of the State, were bound to sustain it. And hence it is clear that the sale of the real estate in dispute, under the judgment of Mr Ross, was a good and valid sale, and such as vested him with the right of his debtor thereto at the time of his decease.

Judgment affirmed.